EDITH VINQUIST and Carl A. Shellberg, Appellants, v. OTTO SIEGERT, Respondent.

(227 N. W. 556.)

Opinion filed October 24, 1929.   Rehearing denied December 10, 1929.

*Lemke & Weaver,* for appellants.

*G. McLain Johnson* and *Theodore Kaldor,* for respondent.

BIRDZELL, J. In February, 1902, Carl A. Shellberg and John E. Lasham entered into a contract whereby Lasham agreed to sell Shellberg 190 acres of land in Traill county for a consideration of $5,320. Shellberg made a cash payment of $320 and entered into possession through a tenant. In 1904, he moved upon the land and has since resided there continuously. Since 1912, his niece, Edith Vinquist, has likewise lived and worked with him upon the premises. In October, 1918, another contract covering the same property was entered into between Lasham and Shellberg whereby the latter became a purchaser of the same land under a crop payment contract calling for the payment of $6,540. Upon the original of this contract there are indorsements of payments as follows: 9/27/19 $257; 9/20/21 $350; 11/17/22 $66.91; 8/14/24 $328.77. During the course of his farming operations Shellberg became indebted to the Hillsboro National Bank. In the fall of 1924, he assigned to the bank his rights under the land contract as collateral security for a note of $1,270. In October, 1925, he and his attorney investigated the status of his indebtedness at the bank and on October 14th, Shellberg and the president of the bank entered into a written stipulation regarding such indebtedness, showing that at that time he owed the bank $2,249, and stipulated that he had no counterclaim or offsets. The stipulation enumerated the notes and provided for immediate payment or security of all except the already secured note for $1,270. In the late summer of 1925, Lasham instituted proceedings for cancellation by notice of the land contract, which were enjoined by an order of the district court dated September 16, 1925. Thereupon a summons and complaint in an ac-

tion by Lasham against Shellberg and the Hillsboro National Bank for the foreclosure of the contract were served upon Shellberg, but the papers were never filed and the action was not tried. At about the same time another action was instituted by the Hillsboro National Bank, as plaintiff, against Shellberg, seeking a foreclosure of the collateral pledge of Shellberg's interest under the land contract as security for the $1,270 note. The complaint in this action was served on Shellberg on September 28th, some two weeks before the stipulation referred to concerning Shellberg's indebtedness to the bank. This action was brought to trial about a year later, in November, 1926, and, after some evidence was taken, a stipulation was entered into under which it was dismissed. The merits of the present controversy emanate from the circumstances in which that action was discontinued. The immediately following facts connected therewith are undisputed: Shellberg gave to the plaintiff therein, the bank, a quitclaim deed. He later received from the bank, through his attorney, the $1,270 note and the $6,540 note which he had given to Lasham under the 1918 contract. The bank executed to Edith Vinquist a lease of the premises in question for a stipulated cash rental of $450 evidenced by a promissory note secured by a chattel mortgage. In addition to this Shellberg paid or caused to be paid $150 to the bank. Edith Vinquist and Shellberg continued to reside upon the land in 1927 and in September of that year the land was sold by Lasham to one Siegert, the defendant herein, for a consideration of $8,200, $2,700 being paid in cash. Shellberg and Vinquist claim that when the stipulation of settlement was made in the Hillsboro National Bank case there was an express agreement that the quitclaim deed was executed as security merely for a continued obligation on the part of Shellberg to pay an agreed amount of $5,000 for title to the premises and that the stipulated payment of cash rental under the lease to Vinquist was in reality to cover interest and taxes. This is disputed and is the main point remaining in controversy. In order to give Siegert title under his contract, clear of the Shellberg contract, Lasham paid the bank $750 for quitclaim of its interest. Siegert has been unable to obtain possession. He instituted an action for that purpose in justice court, which was defended by Vinquist and Shellberg, who in their answer set up their version of the settlement with the Hillsboro National Bank in November, 1926, raising the

question of title and asking that the cause be transferred to the district court. The justice declined to transfer the cause and entered a void judgment against the defendants. See Vinquist v. Siegert, ante, 295, 225 N. W. 806. Thereafter the plaintiffs, Vinquist and Shellberg, instituted the present action against Siegert, alleging, among other things, the security transaction claim to be a part of the settlement of the Hillsboro National Bank suit. They allege readiness and willingness to perform the agreement to pay $5,000 and the refusal of the bank and of Lasham to deed the premises to the plaintiffs. Neither Lasham nor the bank is a party to this suit. The plaintiffs allege that they are in lawful possession of the premises and that the defendant had full and complete knowledge of their rights and equities. They set up the void proceedings in justice court and charge that under the pretended judgment of that court Siegert is threatening to dispossess them of the premises. They ask for a permanent injunction against the enforcement of the pretended judgment and further restraining the defendant from in any way interfering with the plaintiffs' ownership and possession.

The defendant answered admitting substantially the allegations of the complaint with regard to Lasham's original ownership of the land and with regard to the proceedings in justice court involving possession. He alleges his own ownership through purchase from Lasham and admits his purpose to dispossess the plaintiffs. He sets up the settlement of the collateral foreclosure suit in November, 1926, and alleges that by virtue of quitclaim deeds executed by the plaintiffs they had parted with all their rights, title, claim to or demand in the premises and that in turn the Hillsboro National Bank had quitclaimed to Lasham who had conveyed to the defendant by warranty deed, by virtue of which the latter had become the legal owner of the premises and entitled to immediate possession. For a counterclaim it is alleged that the defendant had been unjustly and illegally deprived of possession and his damages incident thereto are set forth. He prays judgment that the plaintiffs be required to set forth their adverse claims, that they be adjudged null and void, that the defendant's title be quieted as to such claims, and that the defendant recover possession and the value of the use and occupancy of the premises and damages suffered. At the conclusion of the trial a judgment was entered de-

creeing Siegert to be the owner in fee simple of the premises and adjudging the plaintiffs to have no right, title or interest in the premises and to have been illegally in possession since September 14, 1927; that they be restrained from asserting, assuming or pretending to have any right, title or interest in the premises except such as might be legally acquired in the future. The plaintiffs appeal from the judgment and demand a trial de novo, also specifying errors of fact.

The first contention of the appellants is that the trial court had no jurisdiction to quiet title, inasmuch as the action had been brought for the purpose of restraining the defendant from proceeding under a void judgment to interfere with the possession of the plaintiffs. It was pointed out in Vinquist v. Siegert, supra, that the plaintiffs, in order to secure relief by injunction against the void judgment of the justice of the peace, were under the necessity of showing that it was not only void but was unjust and inequitable and that to do this they should be required to show that they had a defense to the action in which it was entered, which in this instance meant that they had title to the real estate involved such as would warrant their retaining possession. It would seem from the complaint that the plaintiffs realized that this burden rested upon them; hence, their allegations regarding their claim of ownership. These allegations invited the defendant likewise to set up his claims and the case was tried in the district court without any objection to proceeding under the issues as framed by the pleadings. These issues were properly joined.

It is next contended that the evidence shows the quitclaim deed which the plaintiffs gave to the Hillsboro National Bank to have been given as security for an indebtedness owing to Lasham and not as an absolute conveyance of their interest in the land. On this subject Shellberg testified that when on the second day of the trial of the bank's foreclosure suit against him the matter of settlement came up he told Peterson, a representative of the bank, and attorneys Leslie and Kaldor that they couldn't settle unless he got a deed to the land for $5,000, the first price he had paid for it, and that if they should lease it to his niece the payment under the lease should be applied on interest and taxes; that that was the only way he would settle, Peterson saying they would make an agreement to that effect. He further testified to meeting Peterson in the spring following this settlement and that

Peterson had said if he could pay a good deal of the money he (Shellberg) was sure to get the deed for the land. The plaintiff, Edith Vinquist, testified that when the settlement was made they wanted Shellberg to complete the assignment of the land and he had refused to do so. Using her own words: "He said the only way he will settle will be that he get a deed of the land for five thousand." Whereupon Peterson said they would agree to settle and make an agreement to that effect. She testified that they wanted her to sign the lease as security for the interest and taxes, the bank taking a mortgage on the stock to secure the $450 payment; that the quitclaim deed was to be "For security. Q. Security for what? A. For the land, for the five thousand;" that Peterson said at that time that when she and Shellberg had paid a substantial part of the $5,000 they would get a deed to the land. She talked with Peterson afterward in the street and he told her she would be there for many years to come—meaning on the farm. This testimony is disputed by Peterson, by the attorney who was acting for Shellberg at the time and also by the attorney for the bank, who represents the defendant in this action.

Peterson testified that he at no time made any agreement with either Shellberg or Vinquist that they should have any option or right to buy the land back; that there was never any price of $5,000 or any other agreed price mentioned but that Shellberg had spoken to him during the year 1927 while the lease was in operation, inquiring if he might have a chance to buy the land back at the termination of the contract in the fall of 1927. On cross-examination he said: "There was some discussion with regard to him being permitted to get the land back, but I had no authority to sell the land, and consequently I could not make any deal for Mr. Lasham, or for the bank. . . . Q. And when your said never, you didn't mean there was no such discussion? A. After the settlement was made, it was never taken up, this was prior to the settlement, but we never entered into any agreement. Q. I thought you said you wrote Mr. Lasham letters subsequent to the settlement, or was I mistaken? A. You are mistaken as to that. Q. When did you write these letters to Mr. Lasham? A. During the year 1927, after we leased the land to Miss Vinquist, that is the time I wrote to Lasham several times on the question of Mr. Shellberg, he wanted to get the land back, to buy it back, and I

wrote for him, but I at no time could get any satisfactory answer from Mr. Lasham to sell it to him. Q. That was subsequent? A. Yes." He denied that there was any discussion with reference to the matter at the time of the settlement or just prior to the settlement, but remembered that a telegram had been received from Lasham before the settlement in which the latter had refused to make a new deal with Shellberg. It later developed that the telegram in question had been sent to Kaldor, the attorney for the bank, on the 10th or 13th of November (the date being indistinct). It read as follows: "I will not sell the land to those parties again and tie myself up for a series of years. I and the bank have supported them too long now. If they deed the land back I will rent it to them for one season. Go after my share of the crop before they dispose of it." The action came on for trial on the 22d of November and the stipulation of settlement was entered into on November 23d. Kaldor, the attorney for the bank, testified that most of the talk concerning the settlement took place between him and Leslie, the defendant's attorney, each one consulting his client during the time; that there was never any such conversation as Shellberg had testified to; that no amount was ever mentioned but that before the trial there had been some talk as to what Shellberg could do and that he (Kaldor) had written to Lasham at Shellberg's suggestion, or it might have been at his attorney's suggestion, inquiring if there was any chance of settling the case by giving Shellberg a new contract if they could give security or improve the old contract. Leslie, Shellberg's attorney in that action, testified as a witness for the defendant in this action, identifying the stipulation of settlement in the former action. Concerning it, he said: "If those were not the terms of the agreements, I don't remember what the terms were. But they must be, because I wouldn't sign what I have there, unless they were the terms as I understood them. I don't remember all those things." On cross-examination he was asked concerning the alleged agreement for the purchase of the land by Shellberg at the time. He said he did not remember any such agreement but that Shellberg and Vinquist had stated to him they would like such an agreement but that that was given up before the settlement and there was nothing said at that time about it that he remembered; that afterwards Shellberg told him he wanted to buy the land back and he "asked him what on

earth he wanted to hang on to that land for, he couldn't pay for it," further saying "I remember that." He remembered that Shellberg in talking with him had said he would like to get an agreement that he could purchase the land back but he didn't think he had ever made such a proposition to Lasham. He had no recollection of any such proposition being made or agreement being made at the time of settlement or close to that time; that if there had been any such agreement and if he had known at the time it would have been in the stipulation of settlement.

On this testimony the trial court found that the quitclaim deed to the bank was delivered without any condition whatever and as an absolute transfer of all of the plaintiffs' right, title, claim and interest in the premises in compliance with the agreement made in settlement of the action. We are of the opinion that, upon the trial de novo in this court, in view of the testimony above referred to, it cannot be said that the plaintiffs have established a security transaction by a preponderance of the evidence, and the finding of the trial court upon this matter should not be disturbed.

In reaching this conclusion this court does not merely weigh the testimony of one set of witnesses against that of another in considering whether the plaintiffs have sustained the burden of proof. It is elementary that, where the evidence is conflicting as to the existence of a contract, a court or a jury, in weighing the evidence, may properly consider the nature of the transaction and the attendant circumstances to determine whether or not the probabilities naturally lend support to or negative the existence of such a contract as is claimed to have been made. Upton v. Winchester, 106 Mass. 330; Corbin v. Sage, 44 Mich. 142, 6 N. W. 216; 13 C. J. p. 794. The circumstances in the instant case tend rather to negative such a contract as the plaintiffs claim. Lasham already had all the security that the land was worth for any balance remaining due him under the original contract, and this balance apparently was considerably greater than $5,000. He had already obtained service in an action to cancel the contract, but had not filed his suit. There was no apparent reason why he would relinquish a substantial part of what was due him. The bank already held an assignment of Shellberg's equity and in the settlement it surrendered the $1,270 note and its claim for accrued interest. It also

delivered to Shellberg his note to Lasham for $6,540. The bank did not own the land and it is not reasonable to suppose that it would not only surrender its secured paper but contract to sell to Shellberg for $5,000 land which it did not own and upon which he already owed considerably more than $5,000. Neither is its agency to act for Lasham established. On the contrary, it appears that those who were acting for the bank in negotiating the settlement were acting in the light of Lasham's declared unwillingness to enter into any further contract with him. In view of the state of the record which shows the amount Shellberg owed to the bank and to Lasham, it is highly unreasonable to suppose that the representatives of the bank would have made the agreement which Shellberg claims was made. This would have meant, in effect, that the bank would have received nothing or less than nothing for the surrender of the $1,270 note.

We are not overlooking the fact that the plaintiffs had set up a counterclaim in the action which was settled. This counterclaim is predicated upon the bank's disposing of a threshing machine upon which it had a mortgage. This took place in 1924. In view of the stipulation entered into in October, 1925, concerning Shellberg's indebtedness to the bank, of the statement therein that he had no counterclaim or offset and of an exhibit in the case which shows that he expressly authorized the bank to take possession of the threshing rig and dispose of it, it is difficult to regard this counterclaim as being other than frivolous. At any rate it would not account for the bank's willingness to enter into such a disadvantageous and unreasonable contract as Shellberg claims to have been made. Neither are we overlooking the fact that the plaintiff Shellberg claims to have given checks for $1,500 to apply on the contract of October 1, 1918, on the day that contract was made. This testimony must be considered in light of the failure to mention this payment in the contract and of the well-known practice of stating in contracts of this character the correct amount of the deferred consideration for which the title stands as security. It must be borne in mind, too, that Lasham is not a party to this record and that his version of the proper credit for the $1,500 payment, whether upon the original or the second contract, is not before us further than the negative showing made by him in indorsing the subsequent payments as shown in the statement of facts. Even

if it be assumed that this $1,500 was paid to apply on the 1918 contract, it would still appear that Shellberg's total indebtedness to Lasham and to the bank was greatly in excess of $5,000.

Counsel for the appellants rely upon numerous authorities which regard a conveyance absolute in form as being in reality for security where otherwise it would have the effect of cutting off an equitable right of redemption, or where an indebtedness which furnished the consideration for the transfer continued. See Sherwin v. American Loan & Invest. Co. 42 N. D. 389, 173 N. W. 758; Altenbrun v. First Nat. Bank, 47 N. D. 266, 181 N. W. 590, 908. We do not deem these principles to be applicable here. It is urged in this connection, as showing a continuance of the indebtedness, that the $6,540 note to Lasham was not returned until some time after the settlement was made. The evidence does not show that the bank or its representatives had authority to bind Lasham by any agreement to liquidate Shellberg's indebtedness to him at the figure of $5,000. Furthermore, the retention of the $6,-540 note by Shellberg without explanation is some evidence that he regarded his indebtedness to Lasham as satisfied, or as an obligation for which the bank must henceforth be answerable. The bank, of course, must hold subject to Lasham's prior right to whatever was due or owing. There is no evidence, and it is not contended as we understand the position of the appellants, that, by virtue of the stipulation of settlement, Shellberg became indebted to the bank to the extent of $5,000. The suit that was settled and discontinued was a suit to foreclose an assignment of his equity in the land contract, and the liabilities that were liquidated by virtue of the settlement were much in excess of the amount that he now claims the right to pay for an absolute title. He seeks a much greater advantage at the expense of his adversary than one would gain as a mere debtor or a redemptioner. A debtor or a redemptioner would be required to discharge his obligation. Shellberg has not offered to pay or reinstate his obligation to the bank. He is not offering to pay even his indebtedness to Lasham as it existed at the time. He seeks Lasham's title without inviting him into the litigation to determine what his rights may be. This record clearly indicates that Shellberg stands before the court as one who has made a highly advantageous disposition of his equity in the land, rather than

as one in danger of being compelled to sacrifice some valuable right unless protected by the strong arm of a chancellor.

There are other questions argued which have to do with whether or not the defendant Siegert purchased the land in good faith, without notice of the plaintiffs' rights, and with the property of certain findings of the trial court. In view of the fact that in our opinion the case must be decided against the contentions of the plaintiffs upon the alleged agreement that goes to the basis of their claims, we find it unnecessary to consider the remaining questions discussed in the briefs.

It follows from what has been said that the judgment should be affirmed and it is so ordered.

BURKE, Ch. J., and NUESSLLE, BURR, and CHRISTIANSON, JJ., concur.